2024 IL App (1st) 221787

Nos. 1-22-1787 & 1-22-1790 (consol.)

Opinion filed March 27, 2024

FIFTH DIVISION

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| ERIC J. MERTES and KENDRA MERTES, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiffs-Appellants, | ) | Cook County |
| | ) | |
| v.      (No. 1-22-1787) | ) | No. 2020 CH 04379 |
| | ) | |
| THE VILLAGE OF MT. PROSPECT, | ) | Honorable |
| | ) | Thaddeus Wilson, |
| Defendant-Appellee. | ) | Judge presiding. |

| | | |
|---|---|---|
| THE VILLAGE OF MT. PROSPECT, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellant, | ) | Cook County |
| | ) | |
| v.      (No. 1-22-1790) | ) | No. 2020 CH 04409 |
| | ) | |
| ERIC J. MERTES and KENDRA MERTES, | ) | Honorable |
| | ) | Thaddeus Wilson, |
| Defendants-Appellees. | ) | Judge presiding. |

PRESIDING JUSTICE MITCHELL delivered the judgment of the court, with opinion.
Justice Mikva and Justice Lyle concurred in the judgment and opinion.

**OPINION**

¶ 1    In the first of two related appeals, plaintiff, the Village of Mount Prospect, appeals the circuit court's order affirming the Village hearing officer's decision that defendant, Eric Mertes, qualifies for health insurance benefits under the Public Safety Employee Benefits Act (820 ILCS

320/1 *et seq.* (West 2022)) (appeal No. 1-22-1790). The issues in the Village's appeal are whether the hearing officer clearly erred in concluding that (1) Mertes's disability was the result of injuries sustained while responding to emergencies, therefore qualifying him for benefits, and (2) the Village's obligation to pay Mertes's premiums under the Act attached when his injury was declared catastrophic.

¶ 2 In the second appeal, Eric and Kendra Mertes appeal the hearing officer's order that the Village was not required to reimburse them for premiums paid to another insurer after the Village stopped paying premiums on their Village-provided insurance (appeal No. 1-22-1787). At issue is whether the Village's obligation to pay Mertes's premiums under the Act is obviated by the availability of alternative insurance.

¶ 3 For the following reasons, we affirm the hearing officer's conclusion that Mertes's catastrophic disability qualified him for benefits under the Act and that the Villages' obligation attached when Mertes's injury was declared catastrophic (No. 1-22-1790). We reverse the hearing officer's conclusion that the Village had no obligation to pay Mertes's insurance premiums, and we remand for further proceedings (No. 1-22-1787).

¶ 4                                I. BACKGROUND

¶ 5 Both appeals arise from the same facts.

¶ 6 Mertes worked as a firefighter and paramedic for the Village between 1997 and 2012. Mertes's duties included responding to fire calls, moving heavy duty fire hoses and ladders, and performing search and rescue operations inside burning structures. As a paramedic, Mertes provided emergency medical assistance at accident scenes, residences, and commercial locations, which often required the lifting and transporting of citizens onto stretchers and into ambulances.

Prior to his employment with the Village, Mertes had never injured his back, had never received treatment for back injuries, and had passed a preemployment physical examination and agility test.

¶ 7    Between 1999 and 2012, Mertes suffered numerous back injuries while responding to calls where he provided advanced life support or transported a patient to a hospital. Mertes also injured his back in several instances where he was not responding to an emergency. The parties agree that Mertes suffered at least 17 distinct injuries to his lower back between 1999 and 2012. For most of these injuries, emergency or nonemergency, Mertes was examined by Dr. Michael Fragen, who provided medical services to Village employees, and Mertes was treated with either medication, physical therapy, or both. After Mertes's annual medical evaluation in 2006, Dr. Fragen characterized his condition as a significant lumbar disk herniation as a result of his prior injuries.

¶ 8    On May 5, 2011, Mertes was carrying a patient out of a house on a stretcher when the stretcher slid off a step and began to fall. Mertes grabbed it, supporting the full weight of the 50-pound stretcher and the patient on top of it. Mertes stressed his lower back, requiring him to be transported to the hospital. After a referral to a neurosurgeon, Mertes underwent a spinal fusion surgery followed by physical therapy and was out of work for six months to recover. Though Mertes did return to work in early 2012, he continued to experience pain in his back that prevented him from performing his duties as efficiently as before.

¶ 9    In April 2012, Mertes again injured his back when he was struck by another vehicle while driving a department ambulance from an automotive shop. Mertes missed several shifts but returned to work two weeks later. He worked until October 2012 when he suffered two injuries in the same day, one during a fire hose training exercise and another while responding to an automobile accident. After seeing his physician, he was given leave from the department and did not work another shift. He underwent a second spinal fusion surgery in April 2013 to repair the

wear to the initial fusion site. Mertes filed for a line-of-duty disability pension as a result of his injuries. The Village of Mount Prospect Firefighters' Pension Fund voted on March 18, 2014, to grant Mertes the line-of-duty pension and issued a written decision on March 26. Mertes's line-of-duty pension was made effective retroactively to January 1, 2014.

¶ 10    Throughout his employment, Mertes and his family were covered by the Village's group health insurance plan, pursuant to a collective bargaining agreement. Since April 2014, Mertes has been covered by his wife's insurance plan through her employer, MetLife. On the same date the Fund issued its decision, the Village sent Mertes a letter informing him that his coverage under the group plan ended as of December 31, 2013. The letter also informed Mertes that he could continue his coverage, but he would be responsible for the entirety of his premiums going forward. Mertes, through counsel, sent the Village a demand that it pay his premiums pending the determination of his eligibility under the Act. The Village sent Mertes a benefits application which he submitted in May 2014.

¶ 11    In 2017, the Merteses filed a declaratory judgment action in the circuit court of Cook County demanding the payment of Eric Mertes's premiums pursuant to the Act. The complaint was dismissed without prejudice pursuant to a stipulation that the Village provide Mertes with a hearing on his application. In June 2019, the hearing officer appointed by the Village granted Mertes's application for benefits but denied that the Village had any obligation to pay the premiums on the MetLife plan: "The obligation of the Village is to only pay to Claimant [Mertes] any portion of the premium of the Village-sponsored health insurance plan paid by Claimant from March 14, 2014 to the date that the Claimant commenced coverage under the MetLife Plan"—approximately one month.

¶ 12    The Village filed a complaint for administrative review in the circuit court of Cook County challenging only the hearing officer's conclusion that Mertes was eligible for benefits. The Merteses filed their own complaint for administrative review challenging the conclusion that the Village was not obligated to reimburse the premiums under the MetLife policy. The cases were consolidated, and the circuit court issued separate orders affirming the hearing officer's decisions. The Merteses and the Village each timely filed separate notices of appeal. Ill. S. Ct. R. 303(a) (eff. July 1, 2017). Each case was fully briefed independently, without consolidation, however, in the interest of judicial economy, both appeals are addressed in this opinion.

¶ 13                                    II. ANALYSIS

¶ 14                          Village's Appeal (No. 1-22-1790)

¶ 15                                        A.

¶ 16    The Village first argues that the hearing officer clearly erred in concluding that Mertes's injuries were sustained while responding to what he reasonably believed to be an emergency because Mertes suffered numerous injuries over the course of his career, some during nonemergencies. The Village contends that the hearing officer improperly considered the cumulative effect of those injuries on Mertes's ultimate disability. Mertes argues in response that his disability did not need a single, remote cause, and the hearing officer correctly concluded that the collective contribution of the injuries he sustained during emergency calls was sufficient. Whether Mertes's injury occurred while responding to an emergency is a mixed question of law and fact which we review under a "clearly erroneous" standard. *Pedersen v. Village of Hoffman Estates*, 2014 IL App (1st) 123402, ¶ 52. An administrative decision is clearly erroneous only where the reviewing court is "left with the definite and firm conviction that a mistake has been committed." *AFM Messenger Service, Inc. v. Department of Employment Security*, 198 Ill. 2d 380,

395 (2001) (quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395 (1948)).

¶ 17    The Act provides that full time law enforcement, correctional officers and firefighters killed or catastrophically injured in the line of duty shall have the entirety of their health insurance premiums paid by their public employer:

> "(a) An employer who employs a full-time law enforcement, correctional or correctional probation officer, or firefighter, who, ***suffers a catastrophic injury or is killed in the line of duty shall pay the entire premium of the employer's health insurance plan for the injured employee, the injured employee's spouse, and for each dependent child of the injured employee until the child reaches the age of majority[.]

> ***

> (b) In order for the law enforcement, correctional or correctional probation officer, firefighter, spouse, or dependent children to be eligible for insurance coverage under this Act, the injury or death must have occurred as the result of the officer's response to fresh pursuit, the officer or firefighter's response to what is reasonably believed to be an emergency, an unlawful act perpetrated by another, or during the investigation of a criminal act." 820 ILCS 320/10(a), (b) (West 2022).

Thus, eligibility requires a catastrophic injury sustained in what is "reasonably believed to be an emergency, an unlawful act perpetrated by another, or during the investigation of a criminal act." *Id.* § 10(b).

¶ 18    Under Illinois law, a "catastrophic injury" is synonymous with an injury resulting in a line-of-duty disability pension under the Illinois Pension Code. *Krohe v. City of Bloomington*, 204 Ill. 2d 392, 400 (2003); *Village of Vernon Hills v. Heelan*, 2015 IL 118170, ¶ 33. Because Mertes was awarded a line-of-duty disability pension, neither party here disputes that he suffered a

"catastrophic injury" and has satisfied the first element.

¶ 19    The Village argues that only two of Mertes's injuries were incurred while responding to what could arguably be considered emergencies, that neither of these incidents ended his career, and that the nonemergency automobile accident in April 2012 was the proximate cause of his disability. Under section 10(b), an "emergency" is defined as an "unforeseen circumstance involving imminent danger to a person or property requiring an urgent response." *Gaffney v. Board of Trustees of Orland Fire Protection District*, 2012 IL 110012, ¶ 64. An emergency is not limited to situations where the public is in danger. *Id.* ¶ 67.

¶ 20    The Act provides that a first responder may qualify for benefits if their injury occurred during "what is reasonably believed to be an emergency." 820 ILCS 320/10(b) (West 2022). The inclusion of the term "reasonably believed" allows for broad applicability to the many ways an emergency may arise during a first responder's employment. *Gaffney*, 2012 IL 110012, ¶ 68. Where a first responder suffers multiple injuries, one or more of which occurs during an emergency, those injuries will qualify him for benefits so long as they are a contributing cause of his ultimate disability; they do not need to be the sole cause. *Richter v. Village of Oak Brook*, 2011 IL App (2d) 100114, ¶ 21; see *Ivetic v. Bensenville Fire Protection District No. 2*, 2023 IL App (1st) 220879, ¶¶ 42-43 (holding exposure to carcinogens while responding to emergency situations was cause or contributing cause of plaintiff's cancer, satisfying emergency element and qualifying plaintiff for benefits under the Act).

¶ 21    Here, the hearing officer concluded that it was sufficient for some, but not all, of Mertes's injuries to have occurred while responding to what he reasonably believed to be emergencies, so long as those injuries contributed to his ultimate disability. The hearing officer relied on a series of cases holding that a disability may result from multiple causes and may result from an

aggravation of a preexisting physical condition. See, *e.g.*, *Richter*, 2011 IL App (2d) 100114; *Wade v. City of North Chicago Police Pension Board*, 226 Ill. 2d 485 (2007); *Bahr v. Bartlett Fire Protection District*, 383 Ill. App. 3d 68 (2008); *Phalin v. McHenry County Sheriff's Department*, 381 Ill. App. 3d 185 (2008). The hearing officer credited Mertes's testimony that he believed that many of the calls were emergencies, as well as official reports indicating that several calls required the provision of advanced life support. On review, we are not left with the definite and firm conviction, (*Cinkus v. Village of Stickney Municipal Officers Electoral Board*, 228 Ill. 2d 200, 211), that the hearing officer was mistaken in his determinations that: (1) Mertes suffered a series of injuries in the line of duty, (2) many of those injuries occurred during what Mertes reasonably believed to be emergencies, and (3) those injuries caused or contributed to his ultimate disability. Consequently, the hearing officer's conclusion that Mertes sustained a catastrophic injury in what he reasonably believed to be an emergency was not clearly erroneous.

¶ 22 The Village maintains that apart from the two injuries it concedes occurred in response to emergencies, Mertes was only otherwise injured on nonemergency calls and "patient lifts," where responders assist a person with a physically debilitating injury or illness. In support, the Village cites *Wilczak v. Village of Lombard*, 2016 IL App (2d) 160205, ¶ 24, where a firefighter's injury while lifting a disabled citizen was found to not have occurred in response to an emergency. However, *Wilczak* is distinguishable because it concerned the reasonableness of the plaintiff's belief that he was responding to an emergency and contained a focused analysis of the facts in that case, where the evidence indicated the call was not an emergency and the plaintiff's belief to the contrary was not reasonable. *Id.*

¶ 23 Moreover, the number of injuries that occurred in nonemergency situations is not controlling; rather, it is the degree to which the injuries that did occur during emergencies

contributed to Mertes's ultimate disability. The hearing officer credited the medical evidence that the failure of Mertes's spinal fusion was the catalyst for his disability. That spinal fusion was made necessary after the May 2011 back injury (which the Village concedes was an emergency) aggravated his condition. The hearing officer acknowledged that while some incidents may not have been emergencies, the injuries suffered during emergencies sufficiently contributed to Mertes's disability.

¶ 24                                         B.

¶ 25    The Village next argues that the hearing officer erred in concluding that Mertes was eligible because prior to applying for benefits, Mertes discontinued coverage under the Village's plan and elected to receive coverage under his wife's MetLife plan. The Village argues its obligation to pay Mertes's premiums should have attached only once it was determined he was eligible, and because he was not covered by the Village's plan when he applied, Mertes was not qualified to receive benefits. Mertes responds that the Village's obligation to pay his premiums attached on the date he was granted his line-of-duty disability pension, while he and his family were still covered by the Village's plan. The question of Mertes's eligibility to apply for benefits presents a question of statutory construction, a question of law, which we review *de novo*. *Heelan*, 2015 IL 118170, ¶ 18.

¶ 26    The obligation to pay a claimant's insurance premiums attaches at the time the claimant is deemed "catastrophically injured," which typically coincides with the grant of a line-of-duty disability pension. *Nowak v. City of Country Club Hills*, 2011 IL 111838, ¶ 29. The attachment of the employer's obligation under section 10(a) is not the same as a determination of eligibility under section 10(b). See *Cronin v. Village of Skokie*, 2019 IL App (1st) 181163, ¶ 36. Public policy supports a uniform date of attachment to account for cases where a date of injury is not readily determinable. *Nowak*, 2011 IL 111838, ¶ 21. This case presents such a circumstance: a case "in

which the date of injury will be difficult, if not impossible, to pin down." *Id.* Mertes suffers from a disability that did not result from "a discreet, one-time injury but rather from the accumulation of several prior injuries or the aggravation of a preexisting injury or condition." *Id.*

¶ 27 Often, whether the injury satisfies section 10(b) is not in dispute, and eligibility is established simultaneously with the determination that the injury was catastrophic. Here, however, the Village argues that Mertes's eligibility was still an open question, and the Village's obligation should not have attached until that question was resolved.

¶ 28 By the terms of the Act, every claimant eligible to receive benefits will have suffered a catastrophic injury, and therefore the attachment of the obligation on that date is uniform for all claimants. If a claimant is deemed ineligible, the Village has no obligation, and the dispute as to when the obligation attached is moot. If the claimant is eligible, then there remains a uniform date upon which the obligation to pay the premiums attached. Such a result promotes judicial economy by preventing this issue from being relitigated after every eligibility determination, however long each may take. In the 12 years since *Nowak*, the General Assembly has not seen fit to upset the supreme court's conclusion by amending the Act, and absent any such input, its holding stands. *International Ass'n of Fire Fighters, Local 50 v. City of Peoria*, 2022 IL 127040, ¶ 18 ("[O]ur interpretation is considered part of the statute itself until the legislature amends it contrary to that interpretation." (Internal quotation marks omitted.)). Therefore, the Village's obligation to pay Mertes's premiums attached when he was granted his line-of-duty pension.

¶ 29 The Village argues, however, that because Mertes was not enrolled in the Village's plan at the time he applied for benefits, he is not eligible to receive them. However, the Village's obligation began on the date Mertes was granted his line-of-duty pension, so any benefits to which he is entitled are a continuation of that obligation.

¶ 30    Accordingly, the hearing officer's conclusion that Mertes had satisfied the statutory requirements to receive health benefits under the Act was not clearly erroneous.

_____

¶ 31                    Mertes's Appeal (No. 1-22-1787)

¶ 32    In their appeal, Eric and Kendra Mertes argue that the hearing officer erred in concluding that the Village is not obligated to reimburse them for premiums paid on the MetLife plan between 2014 and the present—the time between the Pension Board's determination and the adjudication of their claim under the Act. The Village argues that section 10(a)(1) of the Act reduces its obligation to zero when benefits are payable from another source, and that the availability of the MetLife plan triggered that reduction and entirely eliminated the Village's obligation to pay Mertes's premiums. Because this issue hinges on the interpretation of this statutory language, our review is *de novo*. *Heelan*, 2015 IL 118170, ¶ 18.

¶ 33    The Act requires a public employer to pay the entirety of a catastrophically injured qualified claimant's health insurance premiums, but creates an offset for other insurance benefits payable from another source. Again, reviewing the language of the Act, it provides in relevant part, as follows:

> "(a) An employer who employs a full-time law enforcement, correctional or correctional probation officer, or firefighter, who, *** suffers a catastrophic injury or is killed in the line of duty shall pay the entire premium of the employer's health insurance plan for the injured employee, the injured employee's spouse, and for each dependent child of the injured employee until the child reaches the age of majority ***. However:
>
> > (1) Health insurance benefits payable from any other source shall reduce benefits payable under this Section." 820 ILCS 320/10(a)(1) (West 2022).

The hearing officer concluded that the Act only requires the Village to pay premiums under its Village-sponsored insurance plan, and as a consequence, it had no obligation to reimburse premiums Mertes paid on the MetLife plan that he obtained through his wife's employment.

¶ 34 The language of the Act mandates that the public employer pay the "entire premium of the employer's health insurance plan" for a catastrophically injured or killed first responder that otherwise qualifies. Indeed, our supreme court has held that this mandate expresses the very purpose of the Act:

> "[The Public Safety Employee Benefits Act] was enacted to protect officers who *already* have been forced into retirement by a line-of-duty injury. It provides a *postemployement* benefit, designed to ensure that the termination of an officer's employment, whether by death or by injury, does not likewise precipitate the termination of his or her family's employer-sponsored health insurance coverage." (Emphasis in original.) *Nowak*, 2011 IL 111838, ¶ 16.

¶ 35 The Act is silent, however, on the issue presented in the Mertes' appeal: who bears the financial burden for the catastrophically injured first responder's health insurance premiums from the time he is determined to be catastrophically injured and no longer able to work (here March 18, 2014) until it is determined that he qualifies for benefits under the Act? The hearing officer's conclusion that Mertes qualifies for benefits under the Act, but nonetheless forfeited his right to such benefits by obtaining alternative insurance, seems particularly anomalous since Mertes' need for the alternative insurance was occasioned by the Village terminating his benefits after he was catastrophically injured and no longer able to work as a first responder. The text, structure, or purpose of the Act does not support the notion that a catastrophically injured first responder must sacrifice insurance coverage for himself and his family while he awaits a determination on his

eligibility for benefits under the Act. Quite the contrary, the Act "ensures a continuation of health insurance coverage *following the termination of the officer's employment*." (Emphasis in original.) *Nowak*, 2011 IL 111838, ¶ 17.

¶ 36    There is language in the Act that purports to "reduce benefits" payable under the Act by health insurance benefits payable from another source. 820 ILCS 320/10(a)(1). It is this provision, the Village contends, that extinguishes its obligation to provide health insurance benefits under the Act. But again, Mertes' need for MetLife policy arose because the Village terminated his health insurance. This was not some duplicative coverage already in place. The Village refused to pay Mertes' health insurance premiums[1] and informed Mertes that to continue his coverage under COBRA, he would be required to pay the entirety of his premiums.[2] The MetLife plan available through Mertes' wife's employer was significantly less expensive than the Village's plan, and it was perfectly reasonable for Mertes to elect that option while he waited for a determination of his eligibility for benefits under the Act. To credit the Village's interpretation of section 10(a)(1) would create a perverse incentive for a public employer to deny all health insurance benefits pending an eligibility determination in the expectation that the catastrophically injured first responder would obtain alternative benefits in the interim, which would then extinguish the public

---

[1]    In fact, after Mertes's line-of-duty pension was granted in March 2014 and made retroactive to January 1, 2014, the Village demanded reimbursement of expenses incurred related to his insurance coverage between January and March (during which time he was both employed and covered by the Village). Mertes paid the demanded reimbursement.

[2]    Enclosed with his application for benefits, the Village provided Mertes with a document entitled "Public Safety Employee Benefit Act Procedure," outlining the applicants responsibilities in seeking benefits from the Village. This document does not require applicants to maintain coverage under the Village's plan during the pendency of their application, it merely informs them that they "*may* remain on the Village's health insurance plan," (emphasis added) provided they pay 100% of the premium cost.

employer's obligation to provide any benefits under the Act. Such an absurd result is incompatible with the purpose of the Act.

¶ 37    Similarly flawed is the contention that the mere availability of other health insurance (regardless of entitlement, level of coverage, or cost) disqualifies a catastrophically injured first responder receiving benefits under the Act. Under such a reading, the availability of health insurance in the open marketplace or through the Patient Protection and Affordable Care Act (42 U.S.C. § 18001 *et seq.*) would seemingly always eliminate the public employer's obligation under the Act. A public employer would then rarely, if ever, be obligated to fulfill the requirements of the Act, a result the legislature surely did not intend. See *Chapman v. Chicago Department of Finance*, 2023 IL 128300, ¶ 29 ("[S]tatutory provisions should be read so that no term is rendered superfluous or meaningless.").

¶ 38    In reality, public employers in Illinois do *not* treat their catastrophically injured first responders in such a shabby manner. The General Assembly's Commission on Government Forecasting and Accountability has issued a report on the implementation of the Act, and it has found that nearly 20% of claimants under the Act simultaneously receive benefits from alternative plans, with 7% of claimants receiving benefits from plans provided by their spouse's employer. Comm'n on Gov't Forecasting and Accountability, Ill. Gen. Assem., *Study of the Public Safety Employee Benefits Act Pursuant to P.A. 98-0561* 8 (2022). Thus, in practice, the existence of additional insurance does not operate to foreclose a claimant's eligibility for benefits under the Act. This reality is certainly more congruous with the Act's purpose.

¶ 39    In arguing for a contrary result, the Village relies on a trilogy of appellate court cases that have held that Medicare eligibility can reduce or eliminate benefits under the Act. See *Pyle v. City of Granite City*, 2012 IL App (5th) 110472, ¶ 24; *McCaffrey v. Village of Hoffman Estates*, 2021

IL App (1st) 200395, ¶ 21; *Barry v. City of Chicago*, 2021 IL App (1st) 200829, ¶ 27. Medicare presents comprehensive federal health insurance "guaranteed to working individuals in the United States who reach a designated retirement age and have paid Medicare taxes." *Pyle*, 2012 IL App (5th) 110472, ¶ 26. The holding in these cases is difficult to square with the Act's expansive promise to pay "the entire premium" for the "injured employee, injured employee's spouse, and for each dependent child." 820 ILCS 320/10(a)(1). However, it is a tension that we need not resolve here since those cases by their own terms are limited to the Medicare context. Those cases simply do not speak to the situation presented in this case.

¶ 40    In short, we conclude that the hearing officer erred in his interpretation of the Act. By securing alternative insurance when the Village stopped paying for his insurance, Mertes did not forfeit his right to benefits under the Act. He in essence sought "cover" and mitigated his damages pending a determination as to his eligibility for benefits under the Act. See *Kelly v. Chicago Park Dist.*, 409 Ill. 91, 98 (1951) (holding that a plaintiff's duty to mitigate damages arises in virtually any type of civil action). Mertes's decision to avail himself of alternative insurance coverage through his wife's employment was a reasonable effort to limit the harm caused by the Village's decision to stop paying for his health insurance. In light of the hearing officer's conclusion that Mertes was eligible for benefits under the Act (a conclusion which we affirm in the Village's appeal (No. 1-22-1790)), and that the right to those benefits attaches upon the determination that the first responder is catastrophically injured (*Nowak*), there is no principled reason to deny Mertes reimbursement for the premiums he paid while waiting for that determination. *Cf. Pyle*, 2012 IL (5th) 110472, ¶ 32 (affirming circuit court order that city pay insurance premiums for a period of time). In order to put the Merteses in the same position that they would have been had the Village paid "the entire premium" from the date of Mertes's disability determination, the Village must

reimburse the Merteses for the premiums they paid on the MetLife policy.

¶ 41    Accordingly, we affirm the hearing officer's ruling ordering the Village to reimburse Mertes for the premiums paid between March 18, 2014, and the date he enrolled in the MetLife plan. We reverse the hearing officer's ruling that the Village is not obligated to reimburse Mertes for the premiums paid under the MetLife plan. We remand for an accounting of all premiums paid by Mertes on that plan between March 18, 2014, and the present, and order that the Village reimburse Mertes for the premiums he paid on the MetLife policy. Further, the hearing officer is directed to order that Mertes be enrolled in the Village's open enrollment period, should he so choose, whereafter his premiums will be paid by the Village in accordance with section 10(a) of the Act.

¶ 42                                  III. CONCLUSION

¶ 43    For the foregoing reasons, the ruling of the hearing officer granting Mertes's application for benefits under the Act is affirmed. The hearing officer's ruling that the Village is only obligated to pay the premiums incurred on its own plan is affirmed in part, reversed in part, and remanded with directions.

¶ 44    No. 1-22-1790 – Affirmed.

¶ 45    No. 1-22-1787 – Affirmed in part, reversed in part, remanded with directions.

*Mertes v. Village of Mt. Prospect*, **2024 IL App (1st) 221787**

| | |
|---|---|
| **Decisions Under Review:** | Appeal from the Circuit Court of Cook County, No. 20-CH-04379; the Hon. Thaddeus L. Wilson, Judge, presiding. |
| | Appeal from the Circuit Court of Cook County, No. 20-CH-04409; the Hon. Thaddeus L. Wilson, Judge, presiding. |
| **Attorneys for Appellant:** | Thomas W. Duda, of Law Offices of Thomas W. Duda, of Palatine, Illinois, for appellants. |
| **Attorneys for Appellee:** | Jason Guisinger, Anne Skrodzki, of Klein, Thorpe, & Jenkins, Ltd., of Chicago, for appellee. |